426 P.2d 667

**Howard SMITH, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent, Southwest Forest Industries, Inc.**

**No. 1 CA–IC 116.**

Court of Appeals of Arizona.
April 19, 1967.

William J. Meyers, Flagstaff, for petitioner.

William W. Stevenson, Flagstaff, for respondent, Southwest Forest Industries, Inc.

Robert K. Parks, Chief Counsel, by Joyce Volts, Phoenix, for respondent, The Industrial Commission of Ariz.

STEVENS, Judge.

This case is before the Court on a writ of certiorari granted on application by the petitioner to review the lawfulness of an award of The Industrial Commission of Arizona.

The petitioner suffered an accidental injury on 22 October 1964 while working the night shift. It occurred between 9:00 and 10:00 p. m. Petitioner was working on the "green chain", pulling green sawn lumber on a chain-operated conveyor mechanism. The lumber was icy, and petitioner's hands slipped off it, causing him to lose his footing and fall forward with his weight on both outstretched hands and arms.

The award complained of was issued by the Commission on 1 August 1966 and contained these findings:

"1. No authorization was obtained for the medical services performed by Dr. Lynch subsequent to applicant's discharge from Dr. Dierker, the only authorized physician by the employer under the provisions of A.R.S. § 23-1087.

"2. Medical evidence of record reflects applicant was in need of no further medical care or treatment from the date of his discharge, October 29, 1964.

"3. Medical evidence of record reflects applicant has no residual disability attributable to the accident in question.

"4. Applicant was not disabled in excess of 7 days."

The question to be determined by this Court is whether the award and findings are supported by reasonable evidence.

Pursuant to Rule 59 of The Industrial Commission, petitioner was seen, examined and treated by a doctor selected by the respondent employer, Dr. Dierker. Dr. Dierker treated the petitioner through 29 October 1964, when he testified he discharged him.

The petitioner is a Navajo Indian. At the hearing, he testified through a Navajo interpreter. Dr. Dierker testified that he speaks no Navajo, and that he was not able to communicate fluently with the petitioner. He described petitioner's capacity to express himself in English as "extremely limited". He stated that his examination of petitioner lasted approximately 10 minutes, and that there was no interpreter present. The doctor testified that he obtained the history of the accident and petitioner's symptoms directly from him by means of "motions and pantomine". Dr. Dierker admitted on cross-examination that his examination on 23 October was "cursory", and further admitted that the x-rays he had had taken would show only bone damage, and not soft tissue damage.

Dr. Dierker stated that he saw the petitioner again in November 1964. He testified on cross-examination as follows:

"Q * * * Could you tell me why your observations of the patient as they occurred in November a month following, approximately a month following the initial injury, could not within your medical judgment, have been related in any fashion with the injury sustained on the 22nd of October?

"A Because the injury as described and my examination at the time of my initial examination on the 23rd, limited his injury to the diagnosis described in the initial report. There was no damage to the neck and there was no damage to the right side of the body.

"Q Were the laboratory studies performed at that time sufficient to ad-

vise you as to whether there were or were not any injuries to the neck or spinal column?

"A There were no complaints referable to the neck. The injury as described was by his motions and pantomime did not warrant any studies of the neck, and there were, as I say, again no complaints referable to the neck."

Dr. Dierker urged petitioner to go to the Indian Hospital at Tuba City for a complete neurological examination. Petitioner declined to do this, and was treated by a naturopath, Michael Lynch, N. D., in January and February of 1965. Both the petitioner and Dr. Lynch attempted to secure authorization for these treatments, Dr. Lynch from both Industrial Commission and the employer, and the petitioner from Mr. Gilbert Busch, a Supervisor of the employer. The Industrial Commission referred Dr. Lynch back to the employer. He testified that he had talked to Mr. Busch on more than one occasion, as the petitioner and his wife had conveyed to him the idea that the employer had given permission for them to consult another physician. He testified that Mr. Busch told him during their first conversation to submit his bill and it would be considered if it wasn't too high. The petitioner's wife, who is bilingual in Navajo and English, also talked to Mr. Busch. She testified that he told her petitioner could go to any doctor he wanted and the next day petitioner went to Dr. Lynch. Mr. Busch testified that the petitioner and his wife had come to his office. He described that meeting as follows:

"A I believe it was on a Friday night. January 15 of 1965. I had been in a meeting, and it was sometime after our normal quitting time. Howard and Mrs. Smith were waiting for me.

"They came in, and I believe Mrs. Smith asked if Howard could have a lighter job. She said something about he had been on the green chain for about nine years, and he would like to get off it. I told her at the time that I knew of no other job available that would be lighter. Then she mentioned that Howard has some numbness in his hand and there was no reference made to the injury. I had forgotten that he had been injured. I suggested, 'Well, you ought to see a doctor,' and I suggested seeing Dr. Dierker.

"She said immediately, 'No, we don't want to see Dr. Dierker.'

"I said, 'Of course, this is your privilege: to see any doctor you want, but if I had numbness in my fingers, I would sure find out what was causing it.'

"That was about the extent of the conversation.

"Q At any time during this conversation did they relate this numbness to the accident that had previously occurred?

"A No, there was no reference made to it at all."

It is apparent from the record that the petitioner and his wife thought that the employer had authorized petitioner to seek treatment from another doctor. Mr. Busch testified that he did not give such an authorization; however his own testimony concerning his interview with the petitioner and his wife explains why they believed he had given them permission for petitioner to see another doctor for treatment of his industrial injury. This is what petitioner's wife testified he had told them: "You could go to any doctor you want." That is exactly what he said, taking his statement literally: "Of course, this is your privilege: to see any doctor you want * * *"

■ It is the opinion of the Court that the Commission's finding that no authorization was obtained for the medical services performed by Dr. Lynch is not supported by the weight of the evidence. This alone is

sufficient grounds to set aside the award; however it is our opinion that this case raises another issue which merits our consideration.

Findings #2 and #3 state that the medical evidence of record reflects that petitioner was not in need of further treatment and has no residual disability attributable to the accident. The only evidence that supports these findings is the testimony of the employer's physician, Dr. Dierker. Dr. Dierker testified that his examination of the petitioner on 22 October 1964 was "cursory", and that it was made without an interpreter, even though it was impossible for the doctor to communicate with the petitioner directly. Dr. Dierker discharged petitioner as cured on 29 October 1964, without ever having taken a history from him, or a description of the accident, and in fact, without ever having adequately communicated with him. The petitioner returned to Dr. Dierker a few weeks later with his wife to interpret for him. Petitioner's wife testified that the doctor looked at petitioner's hand and said that it might be the nerve; that he didn't know. The doctor testified, referring to this examination, "I didn't even make a charge or record of it in my office notes. * * *" Petitioner's wife testified that the doctor had told petitioner to go to the Indian Service, but she told the doctor, "If he was sick in any way we would go, but since he was hurt over there at the mill, I don't think he should go."

Dr. Dierker had not seen the petitioner professionally since November 1964, and had not treated him or made an examination of him since 29 October 1964.

Petitioner was given a comprehensive physical examination by David DeWitt Smith, M.D., on 26 July 1965. Dr. Smith testified that he had a Navajo interpreter present at the time of his examination to interpret for the petitioner. He stated that his examination consisted first of taking a history of the patient's work and the injuries that occurred on 22 October 1964. Dr. Smith enumerated the complaints and symptoms that the petitioner described to him

through his interpreter. The doctor testified:

"He stated that he was unable to straighten his right elbow; that he had pain in his left shoulder upon elevation; that he had numbness in his medial three fingers of his right hand extending up the inner aspect of the forearm to the elbow; and also some pain down the ring finger to the wrist, and that he was unable to completely close his right hand and his grip was inadequate to carry on his work.

"He also stated that since the time of his injury he had had aching across the shoulders and at the base of the neck."

Dr. Smith testified that based on his examination and the laboratory examination, he had concluded that petitioner suffered from a muscle irritation syndrome of the left shoulder muscle with a "demonstrated trigger point", and also an adhesion of the capular ligament, with a traumatic irritation of the muscular sheath of the right shoulder. The doctor also found an arthritic type calcification in the right elbow which he attributed to a much earlier accident than that of the 22nd of October 1964. He was asked whether or not these conditions were consistent with the type of injury or accident which petitioner described, and stated that they were consistent. He testified that the cause of the condition was "probably traumatic." He was asked:

"Q   Would you go so far as to say probably the specific trauma that was related to you in the history?

"A   Well, all other trauma being denied, yes.

"Q   And all other trauma was denied by the patient?

"A   Yes."

And later in the testimony:

"Q   * * * you find it not inconsistent with the trauma alleged to have occurred approximately a year ago from the date of this examination?

"A   No, it is not inconsistent."

The doctor was questioned and testified on cross-examination as to whether or not the

injury would have been noticeable by Dr. Dierker at the time of his examination. He pointed out that it would be necessary to communicate with the petitioner in some manner to determine the extent of his injury, and his symptoms. He concluded with this statement: "This whole thing could be elucidated by electromyography if there is a definite nerve root pain. These have a definite electromyographic type of enervation point potential." Dr. Smith stated, "We are haranguing around the point but it can be proven one way or the other." Dr. Smith testified that the electromyography would determine whether a neurologic deficit truly exists, and would also show the point of the injury, whether it be on a nerve, or a cervical root. He also stated that the question of whether the symptoms arise from the ancient injury to the right elbow or from the more recent injury of the 22nd of October, 1964, would be resolved by such an examination.

■ We recognize that there may be industrial incidents wherein adequate verbal communication between the attending physician and the injured employee may not be essential to a proper evaluation of the injury. In our opinion this case illustrates the problems which may arise from inadequacy of communication. In view of the later developments, and Dr. Smith's testimony, it is our opinion that the "cursory" examination of 23 October was not sufficient to warrant the opinion that later symptoms were not related to the 22 October incident. The evidence that was before the Commission does not reasonably support the Findings of the Commission with regard to petitioner's need for further medical treatment, and whether or not petitioner has a residual disability attributable to the accident. It is our view that there was an abuse of discretion in failing to fully explore Dr. Smith's recommendation.

The Award is set aside.

CAMERON, C. J., and DONOFRIO, J., concur.